May it please the court. Davina Chen on behalf of Dr. Julio Diaz, I'd like to reserve three minutes. The government tried this case in a prejudicial manner. There was more inadmissible evidence at trial than admissible evidence. Given the massive amount of emotional, inflammatory, and irrelevant evidence, Dr. Diaz did not have a fair trial. This court must reverse. With the court's permission, I'd like to focus on the first two issues in the brief. First, the government's presentation of extensive evidence of uncharged patient deaths without proving Dr. Diaz caused these deaths, several of which post-dated the charge period and in needless emotional detail that had no their response as you know is that the defense in this case from Dr. Diaz was not really that he denied the conduct as I understand it but that the conduct while perhaps negligent and below the standard of care professionally did not amount to criminal conduct I think although I'm paraphrasing to be sure but so the government argues that under 404 B this all came in to show that these deaths and emergency room visits were basically wake-up calls so in other words to show that there was an absence of mistake I think and I think it's an important issue so I just want to paraphrase it and ask you can you go straight to that why is that wrong I don't believe that their theory was absence of mistake. I believe their theory, which they clearly articulated, was knowledge and intent. Right, but it showed that he knew that the prescriptions that he was writing caused injury and sometimes death or that he had a pattern of prescribing drugs that caused these injuries or deaths. To help you answer, my concern was pattern under 404 B. And awareness, knowledge of what was going on. There were very serious consequences so now we're bombarding you. Yes, so the government's theory was knowledge of intent. I'll also address absence of mistake and pattern. I really want to focus on the concrete evidence in this case. I don't dispute that there is an avenue of admissibility. That there was a way the government could have used some of this evidence. What I'm talking about is the specific evidence that was put in. So for instance, with respect to Cynthia Tupper. She's the only one, it seems to me, where it was really irrelevant because there wasn't testimony tying her death to any of these prescriptions. But if the other evidence of deaths was all admissible, I know you don't agree with that, but if that's the only one, why wouldn't that error be harmless? If that were the only one, it would possibly be harmless. However, Lance Smith and Adam Montgomery died a year after the charge break. So if we're going to absence of mistake, knowledge of intent, pattern in 2008-2010, what possible relevance could deaths that occurred in 2011 have? Much more the details. With Adam Montgomery, we learned what his batting average was as a child and that he was the best baseball and football player. So all of this goes to, I think you have given so many arguments in the brief and you're, I think, candidly acknowledge that you think there's lots and lots of ways this evidence, you know, we can flyspeck it and there may well have been instances where it stepped across the line. You have to show it was prejudicial. What's your best shot at that? My best shot at that is that the government fought tooth and nail to get this in. They could have charged these five deaths, but they didn't. And the reason they didn't was because they could not prove the conduct was illegal in those instances. So what we have is there's no proof that the conduct was illegal in those instances. Let's talk about Stephen Meadows. On the mother, could they have charged the death? I thought she didn't get any painkillers from the doctor. She did get pills, but the mother, I frankly don't even understand why the mother came in. But let's look at the other one. Wait a minute. I want to make sure I've got the facts. Was the mother given narcotic drugs by Dr. Diaz? Yes. Thanks. Yes. And she did die of an overdose? No. No, she died of cancer. Okay, so this is the problem. There is no evidence of cause of death for any of these deaths. The government could have put it in. It specifically elected not to put it in. The government could have charged it if it thought it could prove it, but it did not. It decided to charge other things that occurred in 2008 and 2010, but to try its case based on deaths, some of which post-stated. I really think you have a strong argument on that point, I mean, in some respects. But what about prejudice? Okay. Because there's overwhelming evidence of guilt. That's what they're going to get up and say. Could you go to that point? Yes. Because that's what's troubling me. There's very compelling evidence here. There is very compelling evidence of guilt, but clearly the government didn't think it was enough. They emphasized the death. Well, counsel, we've said many times that we don't try the case for the parties, and the fact that, you know, afterwards we think maybe there could have been less or different really isn't the test. Right. So the burden is on the government to show harmlessness. When we have preserved error, which it was clearly preserved here, and if we're assuming it was error, then harmfulness is presumed, and it's the government's burden to show harmfulness, harmlessness. And it's not enough for the government to show that the properly admitted evidence was sufficient. That's a different standard. What the government has to show is that this evidence, the evidence that we're talking about, and that's why I keep trying to get to it, did not... That assumes that we agree with you that all of it was inadmissible. And that's why I asked you the question I did about Cynthia Tupper, I guess was her last name. Because, at least speaking for myself, the others seemed more closely linked to the prescriptions and the prescription drugs that your client... Yes, I'm trying to answer your question and Judge Christine's question at the same time. So it seems to me like if we want to go through these deaths, so Cynthia Tupper died of cancer. Matthew Davis had been getting prescription drugs from a completely different doctor. We don't even know that Dr. Diaz's prescribing had anything to do with his death. Stephen Meadows is the one that in some way might have been relevant, but let's talk about the way his death was presented. We got pictures of his disabled children. We got pictures of his high school graduation of the disabled children. Counsel, I have a question for you about that. It seems to me that what you preserved in the trial court was an objection to evidence about the deaths specifically. Yes. And I may be mistaken about this, but I don't think you preserved a separate objection that to each of these pieces of, you know, extraneous facts about them that made them sympathetic. Am I right about that, that you didn't separately object to that? I didn't see a specific objection to that, but the government did not argue forfeiture in this case. And this court's precedent, U.S. v. Morgia... Well, it's not a matter of forfeiture. You know, if something isn't preserved, we review for plain error. Only if the government argues for plain error. In this case, it did not. And in any event... What case says that? Morgia-Rodriguez, 815 F. 3rd, 566. It's a Ninth Circuit case from 2016, which specifically says that when the government doesn't argue for forfeiture, plain error doesn't apply. But in any event, the error was not forfeited. The 403 objections were made very clearly from beginning to end. About those specifics or only about the deaths? That's what I'm trying to get at. I just don't think that the defense knew that it was going to come in at this... Well, but when it did, you know, when somebody started talking about a disabled child or about something with baseball or whatever, was there an objection that that was irrelevant and inflammatory? No. But in Curtin, in Waters, in Montgomery, this court has held that the motion in Limoney preserves the objection. And frankly, the denial of that motion in Limoney was definitive. And empirical evidence has showed us that when you object to things in court and you're overruled, the jury pays more attention to that evidence. So we can't put on the defense the burden to object every time evidence is coming in when, in fact, they've already made a motion in Limoney and it's been rejected. The way counsel often deal with that, counsel on both sides and the court, is by stipulating to a continuing objection. Was there any stipulation to a continuing objection? There was a continuing objection, but it was made sort of at the end of the trial. So I don't think it comes... So it's not really a continuing objection? But there was a motion in Limoney. Let me ask you, what was the motion in Limoney exactly? To prevent the evidence of these emergency room visits and deaths as not 404... What about the photos? There was no proffer that there were going to be photos. So, again, it was as specific as it could be. And, in fact, the defense... Counsel, I want to use your 4 minutes and 30 seconds usefully to answer my questions and the other judges' questions. Some of these photos struck me as obviously irrelevant, photos of dead people and photos of dead people's relatives in particular. Was there objection when they were offered into evidence? No. There were not. But this court may still review for plain error, although I don't believe that the court needs to review for plain error because, again... I just hate to review for... Well, never mind. Go ahead. It struck you as obviously irrelevant, and that is the standard on plain error review. Is it clearly erroneous and so obvious that a judge would have noticed it? Well, usually a judge won't keep things out, even if the judge thinks it's probably error to let them in, because the defense lawyer may have a very good reason for not objecting. There may be some strategy the defense is pursuing. For example, in this case, the obvious one would be the government can't prove that this was out of the usual medical course, so they're making this into a daytime television show, showing you pictures of disabled children and dead bodies so that you will be distracted from the medical evidence. That would be a reason, if I were a trial judge in this case, for just letting it go, and I can't see why we should assume the trial judge didn't have a reason for just letting it come in if there was no objection. I think that the objection was preserved with the pretrial motion, which specifically said, the government hasn't even told us exactly what this evidence is going to be, but any evidence of these uncharged patient deaths is prejudicial. So it was a very broad objection. But ‑‑ Counsel, when you come back, I know your time is ticking, so this is where you have time to think about it. Here's what's in my notes that's bothering me. This is the flavor. I think you're going to have to overcome the evidence that the jury heard that, for example, one patient was given three times the maximum dose any normal person should receive of hydrocodone. That came from the government's expert. Another example, and there are many, but another example is that it was below the standard of care to give a one‑year supply to one patient rather than what would be typical, which is a one‑month supply, for example. I mean, you're very familiar with the record, obviously, so these are the kinds of bullet point examples that I think you have to overcome. Absolutely. Maybe you can think about that when you come back, so I don't use your time now. Okay. Okay. Thank you. May it please the Court, Anne Ruato Wolfe on behalf of the United States. Counsel, I had a real problem with this record. It really did read to me more like a daytime television show than a trial. A whole lot of the stuff you put in, it was just garbage. Your Honor. And I can't see any reason for it other than to arouse the jury's emotions. Well, if I may, I will jump then right to the issue of the appellant's argument about the prejudice aspect of the evidence. Why would the government overplay its hand in a case like this? There was so much evidence, and then there's these glaring examples. I agree with Judge Kleinfeld. If I may, I believe that the record has been really distorted in terms of how much of this evidence was actually presented. So let me just go through it. First of all, there were a total of 19 overdose deaths during Dr. Diaz's operation of his pill mill. The government presented evidence to the jury of 12 of those. Why didn't you charge them? Because we did not feel that it was necessary or appropriate to charge him with the deaths, but we wanted the jury to see the context in which the charged prescription— And they needed to see the photographs and the disabled child, counsel? Really? Okay. Again, let me put it in proper context because it really— Okay. So, 12 total that were presented, 8 of them on cross-examination. So that leaves 4 in the government's case-in-chief. Of those 4, only 3 of them— Why would you put in a picture of a disabled child? The dead body—at least some dead bodies have some relevance to the case. The disabled child, I can't see why, except, well, kind of like those ads to get you to contribute to charities on daytime TV. Your Honor, we did not put in evidence of dead bodies to begin with. We specifically did not put in any— Did you put in a picture of a disabled child, or am I misunderstanding? No, that is correct. What for? That was, again, to give some context and voice to the victims who can no longer speak for themselves, but it was really, really a very, very small part of the government's case. So, again, getting to the 3 family members— And the disability had nothing to do with Dr. Diaz? There was a picture of—for certain, I know, we did put in life pictures, not— Fundraisers for charities, no, children on wheelchairs. We did give a face to the victims, yes. Was the disabled child the victim? She was the daughter of the victim. She was the daughter of— Well, they're victims, but yes and no, because you didn't charge those deaths. So, in a literal sense, they're not victims of the charged crime. Right. So the charged counts were 79 counts, each one a prescription of over 50,000 prescriptions. Exactly. Exactly. And, again, the prescriptions are being written to people that he knows. He knows that they are addicts. He knows they are— I agree. There's huge—that's the whole point. Why overplay? Why overplay? I just don't understand. Because it's something that I think the jury is entitled and should— That sounds so phony to me, what you're saying now. Jury is entitled? I mean, spare me. What you have to prove is that he was giving narcotic prescriptions beyond what is acceptable medical practice. And the focus of the case would normally be on your expert witnesses, the various doctors who said this was not appropriate pain treatment. The defense would normally be, except it couldn't have been in this case, I'm a cancer doctor. My patients have a whole lot of pain from cancer, and I have to prescribe a lot more than somebody who is not a geriatrician. His problem would have then been that these are young people. They're not geriatric cancer patients. And instead, it was just a psychodrama with fundraising appeal. Your Honor, with all due respect, what the government has to prove in this case, in any case like it, is that a medical doctor abandoned his oath and, again, let me say, beyond a reasonable doubt, I thought what you had to prove, rather than some drama like that, was that he knowingly distributed or dispensed controlled substances, that they're outside the usual course of professional practice and without a legitimate medical purpose, and that he acted with intent to distribute or dispense the drugs and with intent to distribute them outside the course of professional practice. Correct. Period. Right. And what we are confronted with is a medical doctor who says I had a bunch of lying, manipulative addicts who duped me into giving them prescriptions, and we have to overcome that. Counsel, can I ask you about that point? Yes. You had two experts who testified unequivocally that conduct here was way beyond any legitimate medical practice. Going back to Judge Kleinfeld's question, did the defense have an expert that said that this pattern within this geriatric pain management practice was acceptable? No. Right. So it didn't seem like to me that it was very tough for the government to demonstrate what it needed to demonstrate for a conviction here. Well, the defendant did bring in the California Medical Board investigation, which once upon a time did look at his practice and said that he had complied with the standard of care. Right. They had received a couple of complaints, and he was actually cleared of those, and he testified himself, right, to say that they tricked me, they duped me, and I'm unfairly paraphrasing, but I'll grant you that. But was there any other evidence from the defense to justify this pain, these prescriptions on pain medication? Other than his own testimony, no. But, again, so I just wanted to, again – And you put in a subsequent determination by the medical board that his license needed to be taken away, right? It did come up on the direct of the California Medical Board investigator that his license had been revoked, yes. But that was not discussed any further, but it was mentioned during her testimony. I heard the but, and I heard the not discussed any further. You did put in evidence that rebutted his evidence that he'd been cleared by the medical board by showing that they'd taken his license away, right? Yes, to the extent that, yes, that that would be the evidence. The evidence was that his license had been revoked. That wasn't in your case in chief? It was in response to the defense? No, that was in the case in chief during the testimony by the California Medical Board investigator. But that was the purpose of the testimony of the California Medical Board. It really didn't testify to anything else, did they? That wasn't the point, to say the license had been revoked? No, Your Honor. Okay, so that's helpful to me. What was it for? So she was, I know one of the things that she testified to, for example, was when she made an unannounced visit to his office, and she had witnessed a young gentleman banging on the window saying, I need to get my pills because they had closed for lunch. That was one of the purposes of her testimony. Did she testify about the scene in the waiting room, or who testified about that? I remember reading the testimony about the scene in the waiting room, or was that from a patient? It was Tupper's son, wasn't it? Wasn't that Tupper's son? Yes. So the patients all, I believe, the three patients, four patients who testified, I believe they all testified to the scene in the waiting room about what that was like. Pretty obvious drug-seeking behavior. Yes. But, again, if I could just really quickly get back, because I do think it's obviously a very important issue, to how minimal the actual emotional testimony about which appellant complains was. Those three individuals, so we had a nine-day trial. Their testimony, all of it, takes up 67 total pages. They testified combined for less than an hour during the entire course of the trial. It was an 11-day trial. It's a nine-day trial? I believe it was a nine-day trial. Okay. So you have 67 pages, and that comprises who's in there? And so that is for Stephen Meadows' ex-wife, Matthew Davis' ex-wife, and Adam Montgomery's father. Those were the three individuals, and those were the three times that we put up pictures. Okay. And the photos came in through those witnesses? Correct. And that was the sum total of it, and they testified to, I believe it was, about a few sentences in which they described the way they met, their personality, and then with respect to Adam Montgomery, at the end, his father testified. He did testify to the fact that he had seen him on Thanksgiving, but that's because his death occurred the very next day. What part of the trial was all this emotional stuff put in, beginning, middle, and when? It was spaced, I believe, Your Honor, throughout. I don't believe that it was, as I recall, we interspersed this testimony with the other testimony, that being the former patients, the medical experts, the California Medical Board investigator, and all of the other evidence that was brought in, which included, in addition, of course, the three doctors from Cottage Hospital, and then all of the evidence that we got in through our investigator and our case agent regarding the patient files, the duplicate prescription pads, and the medication log of drugs sold directly out of Dr. Diaz's office. So all of that evidence was the nine days. How do we know? What you want us to believe is that it wasn't a whole lot of the trial that was taken up with the highly emotional stuff and the irrelevance stuff. So even if there's error, it's harmless because of the overwhelming evidence. But it just still leaves me with this nagging concern that what did he need it for? I mean, that's all that there is on appeal is all this garbage emotional stuff. There'd be nothing to appeal otherwise, and I can't figure out why you'd put it in if you didn't think you needed it because your evidence was too weak to sell your case beyond a reasonable doubt. Your Honor, again, the emotional family history impact testimony was very, very minor. But I do believe in this case and in any case going forward that it is really, really important that the government be permitted when a doctor, when we know, when we have evidence that a doctor knows that his patients are addicted, that they are overdosing, and that they are dying. No, Counselor, you didn't charge the deaths. I just, and I'm going to quit belaboring the point because I'm using up all your time, but I just joined Judge Kleinfeld, and I'm only speaking for myself, I guess, on this part, but the government gave the defendant appeal points here that just weren't necessary. And that's my feedback. That's for what it's worth. And can I change the subject and ask you a different question? Certainly, of course, Your Honor. There were physicians offered as lay witnesses. Correct, Your Honor. People who were concerned in the community and have been for some time about the prescribing practices of the defendant, but in closing the government argued, quote, these aren't lay people. These are other doctors. These are other doctors. They would not do something like this likely. So it's an example that's concerning to me because the government didn't qualify these folks as experts and then is really kind of vouching for them as though they're, quote, unquote, doctors, you know, as though they're experts, adjusting to that effect in closing. What's your response, please? Well, my initial response is that this was raised in the reply brief and, therefore, that that particular argument about the fact that it was raised in our closing is waived. Yes, I understand that. But, you know what, we really expect the government to play by the rules, so I want to give you a fair chance to respond. Yes. So my response is, again, that their status of doctors doesn't change the fact that they testified as all what they heard and what they did was all that they testified to. Right, and so when the government says these aren't lay people, these are other doctors, these are other doctors. Correct, in the context of this case because that is, I mean, yes, that is how they were interacting with the defendant who was also a doctor. They were interacting with them as doctors, and this was something that they felt so strongly about that they went to the California Medical Board, they went to DEA, and it is not something that they did lightly, and I believe that that was a fair comment on the fact that this is not easy for them, but it was something that they felt they had to do for public health reasons, and that's why they did it. So why did the prosecution say these aren't lay people? Or how tough is it to qualify them as experts? Maybe that's your best response, it's concerning. That's all. That was, I think probably it's fair that that was a misstatement because they were testifying as lay people, but they were doctors, and that was, I believe, what the reference meant was that they were doctors who. I appreciate your candor, and I think it's always possible to flyspeck. We have the benefit of 20-20 hindsight here, but I wanted to give you a chance to respond, so thank you. Why didn't you have the guy nailed without the emotional evidence? I believe we had him nailed probably without putting up pictures, I agree, Your Honor, but I think it was very important that we definitely let the jury know what he knew about the fact. I don't know why it was important if all you needed was to convict him, and you had him just nailed to the wall with perfectly legitimate evidence. I'm just trying, I wasn't at the trial, so I don't know, and the best inference I can draw for a prosecutor larding the case this way is that it looked like it was going to go south. They're very difficult cases. I will be candid. It is very, very difficult. So you thought you were going to lose on the evidence that was really related to the crimes, and that's why you needed the emotional stuff. Your Honor, I believe that the deaths of the patients is very relevant. I don't put that in the emotional stuff category. I put that in part of the entire course of conduct. A picture of a disabled child is very, of an uncharged death, that's very relevant. Your Honor, that part I grant to you is the emotional part. That is a very, very small part, but not all of the evidence of patient deaths. It makes me think that you didn't think it was harmless error. You thought it was necessary to prejudice the jury. That's the only reasonable inference I can draw so far. Again, if we're talking about the patient death evidence, I do not believe that that is irrelevant by any stretch, nor do I believe that it is designed in any way to just work the jury's emotions. I do believe that that is very significant, relevant, probative evidence of his knowledge, his intent, and the fact that he was prescribing outside. You thought you had to prove, because otherwise who would know that too much narcotics kill somebody? Nobody knows that unless you prove some, show pictures of them dead. It's proof that he knew what was happening, that he knew that he was not helping his patients, he was killing them, and yet he continued. You've exceeded your time. We've kept you. Thank you. Thank you. Thank you. The flip side of that is I don't know how you could beat the case even if they didn't put in all this garbage. Well, you know, if they didn't put in all this garbage, we would know. But it was garbage and they needed it. Well, counsel, it wasn't all garbage. I'm sorry. Forgive me. I'll just make my point. It's not even really a question, but so you have a chance to respond. Yes. The defense didn't have an expert, didn't have anybody to say that this was acceptable medical practice. That's right. My question to you is there's at least one instance I can think of in which your client's reaction to the deaths is demonstrative of his knowledge and pattern. I believe it was Montgomery where he just says, oh, just mark it deceased and give it to the girls up front and, you know, just put it with all the others. That was bad. So that's relevant, is it not? That may have been relevant. So that's also, you know, I mean, I guess I have a hard time seeing that the deaths that are at least appear to be related to the prescription narcotics. I have a hard time seeing that those are not relevant. I see that I'm not going to get you on that. I would like to try to focus on prejudice because I think that I have something to say. So let's be clear, first of all, that it's not just the deaths that were not charged. It was these patients, except for Montgomery, were not charged at all. So these individuals' prescriptions were not part of the charges in this case. And that is very relevant because of this. The nine patients that were actually charged would not have made appealing witnesses. The three that came in acknowledged that they had pain, that they lied to the doctor, that they asked for immunity from the prosecution. They were not appealing witnesses. And they all presented the waiting room as if it was this place where people were just, like, nodding off and trading tips about drug-seeking behavior. But when Aracely Garcia, the CMV investigator, went to that clinic unannounced, what she said was the waiting room was filled with elderly Hispanic patients and that one person stood out like a sore thumb. And the jury heard that. The jury heard that, absolutely. The jury also heard testimony from his staff about his signing and dating prescriptions. Yes. But let me go back to the prejudice issue. So, yes, we have nine unappealing witnesses. So what the jury did was brought in more appealing people. So we brought in Stephen Meadows' wife. We brought in Matthew Davis' wife. What the government did was they brought in more appealing people that they could not have charged. And the reason they could not have charged was because these people had very serious medical issues. Okay? So the government says, oh, there were only 67 pages. I counted way more than that. I don't remember what the number is. But most of this trial, there's tons of evidence about this woman, Marlo Cochran, not even one of the charged patients. And why? Because she had serious medical issues. So what they did was they charged people who maybe didn't have as serious medical issues so that they could show that it was outside the, you know, it was not for a legitimate purpose. But rather than bringing in those witnesses, they brought more appealing witnesses in to sway the jury. And that is just not how you try a case. You don't charge one set of unappealing things and then only bring in the witnesses of the more appealing things. And, again, I understand that this Court generally does not reverse when it finds that the other evidence is overwhelming. But it can and it does when the improperly admitted evidence was also overwhelming. And in this case, it was. Thank you, Counsel. The case just argued is submitted, and we appreciate very much the helpful arguments from both of you.
judges: Kleinfeld, Graber, Christen